UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SADIANT, INC. and SADIANT HEALTH, LLC,

Plaintiffs,

-v.-

PENSTOCK CONSULTING, LLC,

Defendant.

23 Civ. 7872 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Sadiant Health, LLC ("Sadiant Health") and its sole member, Sadiant, Inc. ("Sadiant" or the "Company," and together with Sadiant Health, "Plaintiffs"), operate a mobile- and web-based software application (the "Sadiant Health App" or the "App") that assists healthcare facilities in filling shift vacancies with qualified nurses and clinicians. In 2022, Plaintiffs and Defendant Penstock Consulting, LLC ("Penstock" or "Defendant") entered into a Master Services Agreement (the "MSA"), pursuant to which Defendant agreed to perform various software development services related to the Sadiant Health App. In early 2023, the parties' relationship soured, culminating in a failed attempt to take over the Company by Defendant's President, Joseph Williams, who was then also serving as Sadiant's Chief Technology Officer. Thereafter, according to Plaintiffs, Defendant endeavored to sabotage Plaintiffs by removing and/or destroying proprietary, copyright-protected information housed on Sadiant's computer systems.

Plaintiffs filed the instant action in September 2023, principally seeking — among other forms of legal and equitable relief — a declaratory judgment concerning certain work product that Defendant had developed for Plaintiffs during the course of their partnership (the "Work Product"). In particular, Plaintiffs seek a declaration that the Work Product constitutes "work made for hire" under the Copyright Act, 17 U.S.C. §§ 201-216, which finding would guarantee Plaintiffs full authorship and ownership rights in the work.

Before the Court is Defendant's motion to dismiss the Complaint for lack of personal jurisdiction and improper venue under Federal Rules of Civil Procedure 12(b)(2) and (3), or, alternatively, to change and/or transfer venue pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). In short, Defendant asks the Court to either dismiss this case or transfer it to federal court in Texas — where both parties reside and where the events underlying the Complaint took place — notwithstanding the MSA's forum selection clause, which bestows "exclusive jurisdiction and venue" upon the federal and state courts of Manhattan, New York. For the reasons set forth below, the Court denies Defendant's motion in full.

**BACKGROUND**[1]

A.     **Factual Background**

1.     **The Parties**

Plaintiff Sadiant, a Delaware corporation, develops mobile- and web-based software applications that assist healthcare facilities in filling time-sensitive shift vacancies by matching the facilities with appropriately qualified nurses and clinicians.  (Compl. ¶ 8).  The Company's principal place of business is located in Fort Worth, Texas.  (*Id.*).

Plaintiff Sadiant Health is a Texas limited liability company, of which Sadiant is the sole member.  (Compl. ¶ 9).  Sadiant Health's principal place of business is also located in Fort Worth, Texas.  (*Id.*).

Defendant Penstock is a Texas limited liability company that provides software development services to other businesses on a contractual basis.  (Compl. ¶ 10).  Its principal place of business is located in Northlake, Texas, and all of its members are residents of Texas.  (*Id.*).

---

[1]    This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded allegations of which are taken as true for purposes of this Opinion.  *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  The Court also relies, as appropriate, on a copy of the parties' Master Services Agreement, which is incorporated by reference as Exhibit A to the Complaint (Dkt. #1-1 ("MSA")).  *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that, on a motion to dismiss, courts may consider documents incorporated by reference and documents integral to a complaint).

For ease of reference, the Court refers to Defendant's memorandum of law in support of its motion to dismiss as "Def. Br." (Dkt. #29); to Plaintiffs' memorandum of law in opposition to Defendant's motion as "Pl. Opp." (Dkt. #32); to Defendant's reply memorandum of law as "Def. Reply" (Dkt. #33); and to Plaintiffs' sur-reply memorandum of law as "Pl. Sur-Reply" (Dkt. #36).

### 2.    The Founding of Sadiant

Sadiant was founded in 2016 by three individuals: John Kurth, who would ultimately serve as the Company's Chief Financial Officer ("CFO"); Sarah Snetzer, who would ultimately serve as its Chief Executive Officer ("CEO"); and Leah Cooper, Snetzer's sister and a former charge nurse.  (Compl. ¶¶ 11-13, 29, 37).  The idea for the Company came about when Snetzer and Cooper observed that the traditional process by which healthcare staffing agencies filled shift vacancies — relying on phone calls, texts, and emails — was time-consuming, inefficient, and expensive.  (*Id.* ¶¶ 12-13).  Seeking to streamline this outdated process, Snetzer and Cooper developed a proprietary mobile app and web portal, the Sadiant Health App, that allowed nurses and other healthcare professionals to identify and sign themselves up for available shifts at nearby healthcare facilities.  (*Id.* ¶¶ 14-16).  The Sadiant Health App eliminated the need for healthcare staffing agencies to serve as the "middleman" between facilities and practitioners, enabled facilities to request and accept per diem help in minutes, and provided practitioners with greater flexibility in setting their own schedules.  (*Id.* ¶ 15).

The Sadiant Health App was first launched in North Texas in February 2018.  (Compl. ¶ 19).  In late 2018, the App expanded into East Texas, adding hundreds of health care professionals to its existing North Texas network.  (*Id.* ¶ 20).  During the COVID-19 pandemic, the App expanded even further; specifically, into Tennessee, Mississippi, Oklahoma, Florida, and Georgia.  (*Id.*).

Today, the App continues to be used as a solution for alleviating nursing shortages.  (*Id.* ¶ 17).

### 3.    The Development of Sadiant's Relationship with Penstock

On or about October 26, 2019, Sadiant entered into a service contract with software developer Joseph Williams.  (Compl. ¶ 23).  Pursuant to this agreement, Williams performed software development services for Sadiant; in return, the Company granted Williams so-called "incentive units" upon his completion of certain development milestones.  (*Id.*).  In January 2020, Sadiant and Williams entered into a second contract for software development and technology support services, pursuant to which Williams was paid a monthly fee.  (*Id.* ¶ 24).  Having sold the Company on his technological prowess, Williams was thereafter offered the position of Sadiant's in-house Chief Technology Officer ("CTO"), which position Williams accepted on March 2, 2020.  (*Id.* ¶¶ 22, 25).  As Sadiant's CTO, Williams had access to the Company's proprietary and confidential information, as well as its protected computer and communications systems.  (*Id.* ¶ 26).

Since 2015 — long before the inception of his relationship with Plaintiffs — Williams had served as a Managing Member and the President of another company, Defendant Penstock.  (Compl. ¶ 28).  After Williams became Sadiant's CTO, Sadiant hired Defendant to perform software development services for the Company, in the same way Williams (in his individual capacity) had previously done.  (*Id.* ¶¶ 28-29).  On November 7, 2022, Williams, acting in his capacity as President of Penstock, and Kurth, acting in his capacity as CFO

of Sadiant, electronically executed the Master Services Agreement.  (*Id.* ¶ 29; *see generally* MSA).  The MSA broadly governed Defendant's provision of technology and software development services to the Company, "appl[ying] to each [statement of work] entered into between the parties for the furnishing of … [s]ervices."  (Compl. ¶¶ 28-31).  The MSA was backdated to have an effective date of January 1, 2022, almost eleven months prior to its execution.  (*Id.* ¶ 29).

The same day the MSA was executed, Williams and Kurth also executed a Statement of Work (the "SOW"), which agreement was also backdated (providing for an effective date of May 10, 2022).  (Compl. ¶ 33).  Pursuant to the SOW, Defendant was to provide Sadiant with web development, mobile development, UI/UX design, quality assurance, and business intelligence development services, *inter alia.*  (*Id.* ¶ 34).  Together, the MSA and SOW "had the effect of outsourcing most of Sadiant's technology development needs to [Defendant]."  (*Id.* ¶ 35).

### 4. Sadiant and Penstock's Relationship Breaks Down

In early 2023, Sadiant began to experience budget shortfalls.  (Compl. ¶ 36).  Budget cuts were proposed, including reductions to executive salaries and outside technology spend, both of which stood to have a significant impact on Williams and Defendant.  (*Id.*).  Threatened by the anticipated changes, Williams, allied with Kurth, attempted a coup.  (*Id.* ¶¶ 37-39).  Specifically, on May 26, 2023, at a meeting of Sadiant's Board of Directors (the "Board") — then comprised of Snetzer, Williams, Kurth, and a fourth director, Amy

Chan — Williams and Kurth voted to remove Snetzer as Sadiant's CEO. (*Id.* ¶ 38). A day later, on May 27, 2023, Sadiant's shareholders foiled the attempted coup by voting to remove Williams and Kurth from the Board. (*Id.* ¶ 39).

After the coup failed, fearing retaliation from Williams and Defendant, Sadiant demanded that Defendant turn over all work product that it had developed for the Company. (Compl. ¶ 41). On June 12, 2023, Williams resigned as CTO, effective immediately. (*Id.* ¶ 43). On June 16, 2023, the Board formally terminated Sadiant's contractual relationship with Defendant and again demanded, in writing, that Defendant

> cease any and all access [Defendant] may have to [Plaintiffs'] confidential information, intellectual property, or work product (including [Plaintiffs'] technology, code, and/or application) and [turn over] any and all confidential information, intellectual property, or work product in [Defendant's] possession that belongs to [Plaintiffs]. This should be understood to include all work product [Defendant] developed or created for [Plaintiffs] in the course of working for [Plaintiffs].

(the "June 16 Notice") (*Id.* ¶ 44 (alterations adopted)).

The next day, June 17, 2023, the Board terminated Williams as CTO "for cause," with an effective date of June 9, 2023, citing Williams's conduct in the days following his removal from the Board on May 27, 2023. (Compl. ¶¶ 39, 46). According to Plaintiffs, after his removal from the Board, Williams (individually and through his company Penstock) commenced a campaign to "sabotage and injure" Sadiant. (*Id.* ¶ 40). Williams also refused to relinquish

the credentials that the Company needed to access its subscription to Microsoft Azure ("Azure"), a public cloud computing platform that Sadiant used to store its data and intellectual property, including its proprietary code and software, as well as instructions on the use and historical development of the same. (*Id.* ¶¶ 47-49).

Further, according to Plaintiffs, between receipt of the June 16 Notice and August 4, 2023 — when Williams ultimately furnished Sadiant with the Azure credentials (Compl. ¶¶ 50-52) — Defendant and its employees leveraged their access to Sadiant's Azure cloud and other computer systems to:

- Remove or destroy the documentation, redundant code versions, and version control details for Sadiant's deployed proprietary software;

- Reproduce and retain a copy of Sadiant's proprietary, copyright-protected code;

- Access the email accounts of Sadiant officers, directors, and/or employees, including Snetzer, without written consent;

- Delete emails from Williams's and other Sadiant employees' email accounts, "believed to be in an attempt to cover the tracks of [Williams's] and his coconspirators' conduct"; and

- Attempt to alter or disable Sadiant's cybersecurity agents that secured Sadiant's computer systems

(*id.* ¶¶ 52-54).

## B.    Procedural Background

### 1.    The Texas Lawsuit

On June 12, 2023, Sadiant filed a lawsuit in the 431st Judicial District Court for Denton County, Texas. (Compl. ¶ 40 n.2; Def. Reply 4). That

lawsuit, styled *Sadiant, Inc. and Sadiant Health, LLC* v. *Joseph William et al.*, Case No. 23-5046-431 (the "Texas Lawsuit"), brought claims for misappropriation of trade secrets and breach of fiduciary duties against Williams, in his individual capacity, and as a director and officer of Sadiant. (Compl. ¶ 40 n.2).  On August 24, 2023, Plaintiffs filed an Application for Temporary Restraining Order and Temporary Injunction in the Texas Lawsuit (the "TRO Application"), adding Penstock as a defendant in that case.  (Def. Reply 4-5).  Importantly, the TRO Application sought injunctive relief that was, in part, similar to that sought in the instant action.  (*Id.* at 5-6).  On August 29, 2023, the Denton County District Court denied the TRO Application.  (*Id.* at 7).

In the course of the Texas proceedings, Defendant represented in open court that it intended to file a copyright registration related to the Work Product it had developed for Sadiant during the course of their partnership. (Compl. ¶ 57).  According to Plaintiffs, this Work Product qualifies as "'work made for hire' [under the Copyright Act,] so [Plaintiffs are] the author[s] and owner[s] of any copyright in [it]."  (*Id.* ¶ 59).  After Defendant represented its intent to file the copyright registration, Plaintiffs voluntarily dismissed their claims against Defendant in the Texas Lawsuit, concluding that it was necessary for them to file a copyright action in federal court.  (Pl. Sur-Reply 4; Dkt. #16-1 at 70-71).

### 2.    The Present Lawsuit

Plaintiffs filed the Complaint in this action on September 5, 2023.  (Dkt. #1).  Plaintiffs bring four causes of action against Defendant.  (*See generally*

Compl.).  Count One seeks a declaratory judgment, pursuant to 28 U.S.C.

§ 2201, that the Work Product is "work made for hire" under the Copyright Act

and therefore that Plaintiffs possess all authorship and ownership rights in the

Work Product, among other things.  (*Id.* ¶¶ 61-74 (citing 17 U.S.C. §§ 101, 106,

201(b))).  Count Two arises under the Defend Trade Secrets Act, seeking

damages and injunctive relief pursuant to 18 U.S.C. § 1836 for Defendant's

alleged misappropriation of Plaintiffs' trade secrets.  (*Id.* ¶¶ 75-85).  Count

Three alleges violation of the Computer Fraud and Abuse Act, specifically, 18

U.S.C. § 1030, in connection with Defendant's unauthorized accessing of

Sadiant's protected computers.  (*Id.* ¶¶ 86-92).  Count Four requests injunctive

relief, namely, an injunction

> [i] preventing [Defendant] … from accessing Sadiant's computer systems, [ii] prohibiting [Defendant] … from using, copying, disclosing, creating derivative works, or publishing copyright protected or trade secret information, [iii] ordering [Defendant] to return all information that [Defendant] removed or copied from Sadiant's computer systems, including the Work Product created under the terms of the [] MSA and SOW, and [iv] prohibiting [Defendant] … from seeking to obtain a copyright registration on any Work Product.

(*Id.* ¶¶ 93-94).

On October 30, 2023, Defendant filed a motion to dismiss the Complaint

for lack of personal jurisdiction and improper venue under Federal Rules of

Civil Procedure 12(b)(2) and (3), or, alternatively, to change and/or transfer

venue pursuant to 28 U.S.C. §§ 1404(a) and 1406(a).  (Dkt. #16).  The motion

was filed in violation of several of this Court's Individual Rules of Practice in

Civil Cases.  (*See* Dkt. #24).  For one thing, Defendant failed to file a pre-motion submission, which the Court requires for anticipated motions to dismiss.  The Court nonetheless waived its pre-motion submission requirement in this instance and scheduled the remainder of the briefing on Defendant's motion.  (Dkt. #25).

Defendant's motion papers also violated certain of the Court's content and formatting requirements.  (*See* Dkt. #24).  The Court required Defendant to amend its papers to bring them into compliance with the rules, (Dkt. #25), and Defendant thereafter filed an amended version of its motion on November 10, 2023 (Dkt. #29).  Plaintiffs filed their opposition to Defendant's motion on November 22, 2023 (Dkt. #32), and Defendant filed a reply in further support of its motion on December 1, 2023 (Dkt. #33).  After requesting and receiving permission from the Court to do so (Dkt. #34-35), Plaintiffs filed a sur-reply on December 15, 2023 (Dkt. #36).

## DISCUSSION

Defendant's motion seeks to dismiss Plaintiffs' Complaint on two bases: lack of personal jurisdiction, pursuant to Rule 12(b)(2), and improper venue, pursuant to Rule 12(b)(3).  The Court addresses each in turn, declining to dismiss the Complaint on either basis.  The Court thereafter turns to Defendant's motion to transfer venue pursuant to 28 U.S.C. §§ 1404(a) and 1406(a), which motion the Court also denies.

A.    **The Court Denies Defendant's Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2)**

1.    **Applicable Law**

Federal Rule of Civil Procedure 12(b)(2) governs motions to dismiss for lack of personal jurisdiction.  *See generally* Fed. R. Civ. P. 12(b)(2).  On a Rule 12(b)(2) motion, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).  At the pleading stage, a plaintiff need only make "legally sufficient allegations of jurisdiction." *Ball* v. *Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).  In assessing whether this standard is met, a court will construe a plaintiff's allegations "in the light most favorable to the plaintiff," and resolve all doubts "in the plaintiff's favor[.]" *Elsevier, Inc.* v. *Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)).  But the court will neither "draw argumentative inferences in the plaintiff's favor" nor "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks and citations omitted); *accord Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding a motion to dismiss for lack of personal jurisdiction engage in a two-part analysis.  *See generally Bailon* v. *Pollen Presents*, No. 22 Civ. 6054 (KPF), 2023 WL 5956141, at *4 (S.D.N.Y. Sept. 13, 2023).  *First*, the court "must establish whether there is 'a statutory basis for exercising personal jurisdiction'" over the defendant. *Elsevier*, 77 F. Supp. 3d

12

at 341 (quoting *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013)).  In a federal-question case, this statutory basis is typically provided by the forum state's long-arm statute, unless the federal statute under which the case arises "specifically provide[s] for national service of process."  *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted).  *Second*, the court "must decide whether the exercise of jurisdiction comports with due process," that is, it must ensure that the exercise of jurisdiction does not offend the Due Process Clause of the U.S. Constitution.  *Elsevier*, 77 F. Supp. 3d at 341 (citing *Sonera Holding B.V.* v. *Çukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014)).  The due process inquiry requires the court to further establish both that (i) the nonresident defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction and (ii) the court's exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice."  *International Shoe Company* v. *Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

### 2.    Analysis

Here, Plaintiffs do not contest — and Defendant affirmatively asserts — that, applying the standard two-part inquiry outlined above, this Court cannot exercise personal jurisdiction over Defendant.  (*See generally* Def. Br. 3-6; Pl. Opp 3-4).  After all, the claims against Defendant, a Texas limited liability company, "aris[e] exclusively in the State of Texas," stem from "a contract for services and deliverables provided in Texas," and involve conduct "that

occurred in Texas, among Texas residents and Texas entities, conducting business in Texas, with their principal place[s] of business in Texas." (Def. Br. 1). Under these circumstances, the Court has no statutory basis for jurisdiction over Defendant via New York's long-arm statute;[2] further, the Court's exercise of jurisdiction would not "comport[] with due process." *Elsevier*, 77 F. Supp. 3d at 341. [3]

Nonetheless, according to Plaintiffs, the Court can exercise personal jurisdiction over Defendant because Defendant waived any objections to personal jurisdiction when it entered into the MSA. (*See* Pl. Br. 5 (stating that "[i]t simply does not matter" whether the Court's exercise of jurisdiction has a statutory basis or comports with due process)). Specifically, Plaintiffs assert that, pursuant to Paragraph 12 of the MSA, Defendant consented to the jurisdiction (and venue, which the Court discusses later) of this Court:

> The federal and state courts within the Borough of Manhattan in New York, New York shall have exclusive jurisdiction and venue over all controversies arising out of, relating to or in connection with this Agreement and

---

[2]   Under New York's long-arm statute, courts may exercise personal jurisdiction over a non-domiciliary who in person or through an agent: (i) "transacts any business within [New York] or contracts ... to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) commits a tortious act outside New York that injures a person within New York, if certain conditions are met; or (iv) owns, uses, or possesses real property within New York — but only where the cause of action arises from these enumerated acts. N.Y. C.P.L.R. § 302(a); *see Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 244 (2d Cir. 2007). Here, Plaintiffs do not allege that Defendant transacted business in New York; committed a tort in New York; injured a person in New York, or owned, used, or possessed real property in New York.

[3]   At a minimum, due process requires a defendant to have "sufficient contacts or ties" with the forum state to justify the court's exercise of personal jurisdiction. *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 320 (1945). Here, Plaintiffs fail to allege that Defendant has *any* contacts with New York, let alone sufficient ones.

> both parties hereby submit to such jurisdiction and
> venue and waive the defense of forum non convenien[s].

(MSA ¶ 12(i)).

Taking a step back, "[u]nlike subject matter jurisdiction, 'the requirement of personal jurisdiction represents … an individual right, and therefore it can, like other such rights, be waived.'" *Brown* v. *Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) (quoting *Ins. Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)) (alterations adopted).  One of the ways a defendant can waive the personal jurisdiction requirement is by explicitly "consent[ing] to a court's exercise of personal jurisdiction." *Id.*  Further, a defendant can consent to personal jurisdiction by "contract[ing] or stipulat[ing] with another to permit proceedings in a state's courts, notwithstanding the remoteness from the state of [the defendant's] operations and organization." *Id.*

Where a party has consented to personal jurisdiction in a particular forum, "it is not necessary [for the court] to analyze [personal] jurisdiction under [the forum state]'s long-arm statute or federal constitutional requirements of due process" (*i.e.*, the standard two-part inquiry).  *U.S. Bank Nat. Ass'n* v. *Ables & Hall Builders*, 582 F. Supp. 2d 605, 615 (S.D.N.Y. 2008).  Rather, the question becomes whether the forum selection clause at issue is "valid and enforceable."  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.* v. *Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 48 (S.D.N.Y. 2020) ("Where an agreement contains a valid and enforceable forum selection clause, it is not necessary to analyze jurisdiction under New York's long-arm statute or federal

15

constitutional requirements of due process." (alterations adopted) (internal quotation marks omitted)); *see also CV Holdings, LLC* v. *Bernard Tech., Inc.*, 788 N.Y.S.2d 445, 446 (3d Dep't 2005) ("It is well settled that 'parties to an agreement may consent to submit to the jurisdiction of a court [that] would otherwise not have personal jurisdiction over them.'" (quoting *Dine-A-Mate Inc.* v. *J.B. Noble's Restaurant*, 658 N.Y.S.2d 510, 511 (3d Dep't 1997))); *Sterling Nat'l Bank* v. *E. Shipping Worldwide, Inc.*, 826 N.Y.S.2d 235, 236 (1st Dep't 2006) ("[T]he very point of forum selection clauses, which render the designated forum convenient as a matter of law, is to avoid litigation over personal jurisdiction[.]" (internal quotation marks omitted)).

In the Second Circuit, courts apply a four-step test to determine whether a forum selection clause is valid and enforceable. To begin, the court assesses whether the forum selection clause at issue is entitled to a presumption of enforceability: this analysis, in turn, considers whether (i) "the clause was reasonably communicated to the party resisting enforcement"; (ii) the clause is "mandatory… *i.e.*, … the parties are required to bring any dispute to the designated forum [as opposed to] simply permitted to do so"; and (iii) "the claims and parties involved in the suit are subject to the forum selection clause." *Phillips* v. *Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).[4] If the

---

[4] The Court notes that the MSA also contains a New York choice-of-law clause. (*See* MSA ¶ 12(i) ("This Agreement … shall be governed by, construed under, and enforced by the laws of the State of New York, without reference to its conflicts of law principles irrespective of the jurisdiction in which the parties execute this agreement.")). The Second Circuit has instructed that "where a contract contains both a valid choice-of-law clause and a forum selection clause, the substantive law identified in the choice-of-law clause governs the *interpretation* of the forum selection clause, while federal law governs

court finds that the forum selection clause is presumptively enforceable, it turns to a fourth inquiry: "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.* at 383-84 (quoting *M/S Bremen* v. *Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)); *accord Fasano* v. *Yu Yu*, 921 F.3d 333, 335 (2d Cir. 2019).

Turning to the facts of this case, the Court finds that the MSA's forum selection clause is presumptively enforceable. As a reminder, the MSA's forum selection clause dictates that:

> The federal and state courts within the Borough of Manhattan in New York, New York shall have exclusive jurisdiction and venue over all controversies arising out of, relating to or in connection with this Agreement and both parties hereby submit to such jurisdiction and venue and waive the defense of forum non convenien[s].

---

the *enforceability* of the forum selection clause." *Martinez* v. *Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014) (emphasis added). The *Martinez* Court expanded upon the practical implications of this holding:

> [t]he overriding framework [*i.e.*, the four-part test] governing the effect of forum selection clauses in federal courts ... is drawn from federal law. Furthermore, federal law should be used to determine whether an otherwise mandatory and applicable forum clause is enforceable ... *i.e.*, step four in [the four-part] analysis .... In answering the interpretive questions posed by parts two and three of the four-part framework, however, [courts] normally [should] apply the body of law selected in an otherwise valid choice-of-law clause.

*Id.* at 217-18 (internal quotation marks and citations omitted). The Court's analysis herein accords with these directions; that is, the Court applies New York law as to steps two and three of the four-part analysis.

17

(MSA ¶ 12(i)).  With respect to prong one of the *Phillips* analysis, the Court finds that the MSA's forum selection clause was more than "reasonably communicated" to Defendant.  The language of the clause is unambiguous, and the clause appears in the body of the MSA, which was signed by Defendant (and printed on Defendant's letterhead).  (*See generally* MSA).  *See also Speedfit LLC* v. *Woodway USA, Inc.*, 642 F. Supp. 3d 429, 444 (S.D.N.Y. 2022) ("A forum selection clause may be deemed reasonably communicated where the clause at issue appears as a standard section in the main body of an agreement signed by the parties and is phrased in both clear and unambiguous language." (alterations adopted) (internal quotation marks omitted)).

As to prong two, the clause is undeniably mandatory.  The clause's language — that New York Courts "shall have *exclusive* jurisdiction and venue over *all* controversies arising out of, relating to[,] or in connection with this Agreement" (MSA ¶ 12(i) (emphases added)) — clearly manifests an "intent to make [] jurisdiction exclusive," *Fear & Fear, Inc.* v. *N.I.I. Brokerage, L.L.C.*, 851 N.Y.S.2d 311, 313 (4th Dep't 2008); *see also ICICI Bank Ltd.* v. *Essar Glob. Fund Ltd.*, 565 B.R. 241, 253 (S.D.N.Y. 2017) (finding forum selection clause "mandatory" under New York law).

Moving to prong three, the Court finds that all of the claims at issue fall within the scope of the forum selection clause.  To be subject to the MSA's forum selection clause, the claims must fall under the umbrella of "controversies arising out of, relating to[,] or in connection with the MSA." (MSA ¶ 12(i)).  Here, Counts Two and Three, Plaintiffs' claims under the Defend

Trade Secrets Act and the Computer Fraud and Abuse Act, stem from Defendant's alleged exploitation of its access to Plaintiffs' data and intellectual property — access that was both granted and governed by the MSA. (*See* Compl. ¶¶ 75-92). Furthermore, the specific equitable relief that Plaintiffs seek in Counts One and Four is expressly defined, at least in part, by the actual terms of MSA. (*See id.* ¶¶ 61-74 (describing Count One) ("[Plaintiffs] request[] a judicial declaration that [t]he [] MSA dictates that any Work Product created by [Defendant] is a 'work made for hire' ... and [that] [Defendant] is in violation of the [] MSA[.]"), 93-94 (describing Count Four) ("[Plaintiffs] request[] the Court issue an injunction ... ordering [Defendant] to return all ... Work Product created under the terms of the [] MSA[.]")). All of Plaintiffs' claims are thus, at the very least, "relat[ed] to" the MSA. *See, e.g.*, *TGG Ultimate Holdings, Inc.* v. *Hollett*, 224 F. Supp. 3d 275, 285 (S.D.N.Y. 2016) (applying New York law) (finding trade secrets misappropriation and tort claims not directly arising out of agreement nonetheless "related to" agreement).

Finding that the MSA's forum selection clause is presumptively enforceable, the Court next inquires "whether [Defendant] has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 383-84 (quoting *M/S Bremen*, 407 U.S. at 15). Defendant sets forth two arguments as to why enforcement of the forum selection clause would, in this instance, be unreasonable or unjust. Taking each in turn, the Court finds neither availing.

19

Defendant first argues that "[t]he inclusion of the forum selection clause [in the MSA] ... was simply an unintentional mistake" on the part of both parties. (Def. Reply 1). According to Defendant,

> [i]n drafting the [MSA] ... a template form was used which included the forum selection clause .... The parties simply overlooked the New York forum selection clause, despite the fact that all business contacts and transactions of business between [Defendant] and [Plaintiffs] were in Texas. There were no discussions or negotiations or bargained[-]for exchange in advance with Jon Kurth or anyone else at [the Company], concerning the selection of choice of law, venue, jurisdiction[,] or forum and specifically no discussions or negotiations whatsoever concerning New York.

(*Id.* at 2). Defendant apparently seeks to invoke the "mutual mistake" doctrine of New York contract law, pursuant to which a mistake that is "mutual, substantial, material[,] and exists at the time the contract is entered" can invalidate a contract. *ACA Galleries, Inc.* v. *Kinney*, 928 F. Supp. 2d 699, 701 (S.D.N.Y. 2013) (internal quotation marks omitted), *aff'd*, 552 F. App'x 24 (2d Cir. 2014) (summary order). Because the parties mistakenly included the forum selection clause in the MSA, Defendant argues, the clause should not be enforced.

This argument is without merit. As an initial matter, inclusion of the forum selection clause could not have been a *mutual* mistake of the parties, as only Defendant claims to have been mistaken about the presence of the clause; Plaintiffs do not allege that they were similarly misled. (*See* Pl. Sur-Reply 5-6). Furthermore, even accepting Defendant's allegation that it was mistaken, the mutual mistake doctrine "may not be invoked by a party to avoid the

consequences of its own negligence." *P.K. Dev., Inc.* v. *Elvem Dev. Corp.*, 640 N.Y.S.2d 558, 560 (1st Dep't 1996).  Courts have repeatedly enforced forum selection clauses in the face of one party's *post hoc* assertion that it did not know about the clause.  *See, e.g.*, *Zaltz* v. *JDATE*, 952 F. Supp. 2d 439, 455 (E.D.N.Y. 2013) ("[E]ven if plaintiff failed to read the terms she agreed to, she is nevertheless bound by the forum selection clause."); *Weingard* v. *Telepathy, Inc.*, No. 05 Civ. 2024 (MBM), 2005 WL 2990645, at *4 (S.D.N.Y. Nov. 7, 2005) ("[Plaintiff] is bound by the terms of the forum selection clause even if he did not take the time to read it[.]"); *Sun Forest Corp.* v. *Shvili*, 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001) ("[A] signatory to a contact is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents he or she signed." (internal quotation marks omitted)).

Defendant's second argument has greater traction.  Defendant asserts that this case is one in which "exceptional" circumstances dictate that the forum selection clause should not be enforced.  *Atl. Marine Const. Co., Inc.* v. *U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 51 (2013).  Specifically, Defendant cites Plaintiffs' decision to file the Texas Lawsuit before filing the instant action in this Court, which decision, in Defendant's view, constituted a "waiver" of the MSA's forum selection clause.  (Def. Reply 3-7).  Defendant also cites Plaintiffs' failure, in the Texas lawsuit, to obtain injunctive relief akin to that which is sought in this action.  (*Id.*).  In Defendant's view, Plaintiffs filed this action — "in a federal court half-way across the country in a jurisdiction

21

and venue that demonstratively have nothing to do with the litigation" — for the sole purpose of getting a rhetorical second bite at the apple.  (*Id.*).

Notably, where a "party invoking [a forum selection clause] has taken actions inconsistent with [the clause], or delayed its enforcement, and other parties would be prejudiced [by its enforcement]," a court may conclude that the invoking party has "waived" enforcement of the forum selection clause. *Wachovia Bank Nat. Ass'n* v. *EnCap Golf Holdings, LLC*, 690 F. Supp. 2d 311, 328 (S.D.N.Y. 2010) (internal quotation marks omitted).  A court will not, however, "infer such a significant waiver absent a clear indication of intent through a party's actions."  *Ferraro Foods Inc.* v. *M/V Izzet Incekara,* No. 01 Civ. 2682 (RWS), 2001 WL 940562, at *4 (S.D.N.Y. Aug. 20, 2001).  By way of example, "[c]ourts have found implied waiver of [a forum selection clause] where a party has repeatedly represented that [another] venue is appropriate or actively pursued substantive motions [in that venue]," but have declined to find waiver "where [the] parties merely participated in pretrial motions [in an alternative venue]."  *Wachovia Bank*, 690 F. Supp. at 328 (alterations adopted) (internal quotation marks and citations omitted).  Importantly, "there is no bright-line rule for determining whether waiver has or has not occurred."  *Id.*

Here, the Court finds that Plaintiffs did not waive enforcement of the MSA's forum selection clause as to the claims at issue here.  For one, Plaintiffs could not have waived the forum selection clause as to their Copyright Act claim; that claim could not have been brought in the Texas Lawsuit, given that copyright is a matter of exclusive federal jurisdiction.  *See* 28 U.S.C. § 1338(a).

22

As to Plaintiffs' remaining claims, Plaintiffs' conduct in the Texas Lawsuit does not arise to a "clear indication of intent" to waive the forum selection clause. *Ferraro Foods,* 2001 WL 940562, at *4.  The only claims Plaintiffs ever asserted against Defendant in the Texas Lawsuit were tort-based state-law claims for (i) misappropriation of trade secrets and (ii) conspiracy to misappropriate trade secrets and induce breaches of fiduciary duty — not contract-based claims of the type asserted here.  (Pl. Sur-Reply 4; Dkt. #16-1 at 44-47, 50-52).  Plaintiffs neither brought their MSA-based claims against Defendant in Texas, nor represented that Texas was the proper forum for their MSA-based claims against Defendant.  (Pl. Sur-Reply 4).

Moreover, Defendant here was a defendant in the Texas Lawsuit for a very short period of time, during which the parties merely "participated in pretrial motions."  *Wachovia*, 690 F. Supp. at 328 (internal quotation marks omitted).  (*See* Def. Reply 4-7; Pl. Sur-Reply 3 ("Penstock was a defendant in the Texas [Lawsuit] for a total of 15 days.  During that two-week period, no pretrial matters were addressed.  No discovery was taken." (citations omitted))).  Plaintiffs chose to bring the instant federal action only after Defendant "asserted in open court [in the Texas Lawsuit] that [Defendant] planned on registering a copyright in the work product [it] made for [Plaintiffs]," in response to which Plaintiffs found it necessary to pursue a federal copyright action.  (Pl. Sur-Reply 4).  Considering these circumstances, it cannot be said that Plaintiffs have "taken actions inconsistent with [the forum selection clause], or delayed its enforcement," or that "[Defendant] would be prejudiced"

23

by its enforcement.  *In re Rationis Enterprises, Inc. of Panama*, No. 97 Civ. 9052 (RO), 1999 WL 6364, at *2 (S.D.N.Y. Jan. 7, 1999) (internal quotation marks omitted).

Finally, the Court finds that this is not one of "the most exceptional cases" in which it is appropriate to deviate from the Supreme Court's clear instruction that "a valid forum-selection clause … should be 'given controlling weight.'" *Atl. Marine*, 571 U.S. at 63 (quoting *Stewart Org., Inc.* v. *Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)).  The gravamen of Plaintiffs' Complaint is Defendant's alleged breach of its obligations to Plaintiffs under the MSA, and, specifically, the MSA's designation of Plaintiffs as the author and copyright owner of the Work Product — disputes that Plaintiffs never raised in the Texas Lawsuit.  (*See generally* Compl.).  Furthermore, while the Court takes no position as to the viability of such arguments, to the extent findings have been or could be made in the Texas Lawsuit that may lend support to Defendant's positions in this lawsuit, Defendant retains the right to raise preclusion or abstention arguments in this forum, or to bring a motion to stay this action pending a particular decision in that action.

In sum, the Court finds that the MSA's forum selection clause is presumptively valid and enforceable, and that Defendant has failed to rebut this presumption "by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Phillips*, 494 F.3d at 383-84 (quoting *M/S Bremen*, 407 U.S. at 15).  Accordingly, the Court finds that Defendant has

24

consented to this Court's jurisdiction and the Court must deny Defendant's motion to dismiss for lack of personal jurisdiction.

**B.    The Court Denies Defendant's Motion to Dismiss for Improper Venue Pursuant to Rule 12(b)(3)**

### 1.    Applicable Law

"The legal standard for a motion to dismiss for improper venue [pursuant to Federal Rule of Civil Procedure 12(b)(3)] is the same as a motion to dismiss for lack of personal jurisdiction."  *Casville Invs., Ltd.* v. *Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co.* v. *Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).  As before, the plaintiff bears the burden, but need only make a *prima facie* showing that venue is proper. *Id.*  Further, the court is obligated to credit the plaintiff's factual averments as true, construe the pleadings in the light most favorable to the plaintiff, and resolve all doubts in plaintiff's favor.  *Id.* (citing, in order, *Robertson-Ceco Corp.*, 84 F.3d at 567; *Boehner* v. *Heise*, 410 F. Supp. 2d 228, 240 (S.D.N.Y. 2006); *Porina* v. *Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); and *Martinez* v. *Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012), *aff'd*, 740 F.3d 211 (2d Cir. 2014)).

Whether venue is "improper" for the purposes of Rule 12(b)(3) is governed by 28 U.S.C. § 1391.  *Wynn*, 509 F. Supp. 3d at 49.  Section 1391 specifies that venue is proper in a particular district if (i) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located; (ii) a "substantial part of the events or omissions giving rise to the claim occurred" in the district; or (iii) a defendant is subject to personal

jurisdiction in the district and "there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391.

### 2.    Analysis

Pursuant to Section 1391(b)(i), this District is a proper forum for this case.  While none of the events giving rise to Plaintiffs' claims occurred in this District, defeating venue under Section 1391(b)(ii); and there is at least one other district in which this action may be brought, defeating venue under Section 1391(b)(iii); Section 1391(b)(i) allows for venue in this District.  This is because, by virtue of the fact that Defendant is subject to this Court's personal jurisdiction, *see* Section A.2, *supra*, Section 1391(c)(2) dictates that Defendant "resides" in this District for the purposes of Section 1391(b)(i).  *See* 28 U.S.C. § 1391(c)(2) ("[A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside [for venue purposes] … in any judicial district in which such defendant is subject to the court's personal jurisdiction[.]"); *Wynn*, 509 F. Supp. 3d at 50.

Further, "[v]enue, as with personal jurisdiction, may be created by the contractual agreement of the parties."  *Nat'l Union Life Ins. Co.* v. *Casmalia Res. Ltd.*, No. 89 Civ. 1045 (SWK), 1990 WL 102199, at *5 n.4 (S.D.N.Y. July 11, 1990).  The Court has already determined that the MSA's forum selection clause is valid and enforceable, *see* Section A.2, *supra*.  And the MSA's forum selection clause applies with equal force to questions of personal jurisdiction and of venue:

> The federal and state courts within the Borough of
> Manhattan in New York, New York shall have *exclusive
> jurisdiction and venue* over all controversies arising out
> of, relating to or in connection with this Agreement and
> both parties hereby submit to *such jurisdiction and
> venue* and waive the defense of forum non convenien[s].

(MSA ¶ 12(i) (emphases added)).  Accordingly, by virtue of the forum selection

clause, venue is proper in this Court.  *See Casmalia Res. Ltd.*, 1990 WL

102199, at *5 n.4 ("As the Court has personal jurisdiction by virtue of the

forum selection provision, venue is similarly proper."); *see also Wynn*, 509 F.

Supp. 3d at 50 n.6.

For the foregoing reasons, the Court finds that venue in this District is

proper.  The Court thus declines to dismiss Plaintiffs' claims on this basis.

## C.    The Court Denies Defendant's Motion to Transfer Pursuant to Either 28 U.S.C. §§ 1406(a) or 1404(a)

### 1.    Applicable Law

Generally speaking, two federal statutes — 28 U.S.C. §§ 1404(a) and

1406(a) — govern motions to transfer venue.  Both allow a federal district court

to transfer a case to another federal district court, so long as the transferee

court is one in which the action could have initially been brought.  *See

Wohlbach* v. *Ziady*, No. 17 Civ. 5790 (ER), 2018 WL 3611928, at *3 (S.D.N.Y.

July 27, 2018).  However, which of the two statutes applies depends on the

particular circumstances of the case.

"When the district court initiating the transfer is not the proper venue of

the action, [Section] 1406 governs[.]"  *Wohlbach*, 2018 WL 3611928, at *3.

Specifically, Section 1406(a) provides that:

27

> [t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a).  Section 1406(a) was created to "avoid 'the injustice which ha[d] often resulted to [a] plaintiff[] from dismissal of [her] action[]'" merely because she filed her case in a forum that she mistakenly believed was proper. *Spar, Inc.* v. *Info. Res., Inc.*, 956 F.2d 392, 394 (2d Cir. 1992) (quoting *Goldlawr, Inc.* v. *Heiman*, 369 U.S. 463, 466 (1962)).

Unlike Section 1406(a), Section 1404(a) "does not condition transfer on the initial forum's being 'wrong.'" *Atl. Marine*, 571 U.S. at 59.  To the contrary, Section 1404(a) empowers a federal district court, which is otherwise a proper forum for a particular civil action, to nonetheless transfer that action to another federal district court.  *Id.* at 59-60.  A transfer motion pursuant to Section 1404(a) thus addresses the question of whether a venue other than the initial forum is more appropriate to hear the case.  *Id.*

To that end, Section 1404(a) "permits transfer to any district where venue is also proper," so long as the transfer is "in the interest of justice." *Atl. Marine*, 571 U.S. at 59.  Accordingly, in considering a motion to transfer under Section 1404(a), a court first considers whether the case could have been brought in the proposed transferee district.  *See Herbert Ltd. P'ship* v. *Elec. Arts Inc.*, 325 F. Supp. 2d 282, 285 (S.D.N.Y. 2004).  The Court then determines if transfer is "in the interest of justice," namely, by weighing various private- and

28

public-interest factors.  *See ICICI Bank*, 565 B.R. at 250-51.  In the Second

Circuit, courts generally consider the following non-exclusive list of factors:

> [i] the convenience of the witnesses and the availability
> of process to compel the attendance of unwilling
> witnesses; [ii] the convenience of the parties; [iii] the
> location of relevant documents and the relative ease of
> access to sources of proof; [iv] the locus of operative
> facts; [v] the relative means of the parties; [vi] the
> comparative familiarity of each district with the
> governing law; [vii] the weight accorded to the plaintiff's
> choice of forum; and [viii] judicial economy and the
> interests of justice.

*Bank of Am., N.A.* v. *Wilmington Tr. FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y.

2013).  Ultimately, "the decision to transfer venue is within the discretion of the

[district] court based on 'an individualized, case-by-case consideration of

convenience and fairness.'" *Id.* (quoting *In re Northwest Airlines Corp.*, 384 B.R.

51, 60 (S.D.N.Y. 2008)).

### 2.    Analysis

Because the Court has already concluded that venue in this Court is

proper, *see* Section B.2, *supra*, it denies Defendant's motion to dismiss

pursuant to Section 1406(a), and considers only Defendant's motion pursuant

to Section 1404(a).  In considering Defendant's Section 1404(a) motion, the

Court must determine both whether Defendant's chosen district, the Eastern

District of Texas, is a proper forum for this dispute, and whether transfer to

that District would be "in the interest of justice."  *Atl. Marine*, 571 U.S. at 59.

As to whether the Eastern District of Texas is a proper forum, the Court

finds that it is.  By virtue of the fact that Defendant's members are residents of

Texas, Defendant "resides" in the Eastern District of Texas for the purposes of personal jurisdiction.  (Compl. ¶ 10).[5]  Accordingly, the Eastern District of Texas both has personal jurisdiction over Defendant and is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1).  *See generally* 28 U.S.C. §§ 1391(c)(2) ("[A]n entity … shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction[.]"), 1391(b)(1) ("A civil action may be brought in a judicial district in which any defendant resides[.]").

As to whether transfer to the Eastern District of Texas is in the "interest of justice," however, the Court finds in the negative.  Again, as with the Court's personal jurisdiction and venue analyses, "the presence of a valid forum-selection clause requires district courts to adjust their usual [Section] 1404(a) analysis."  *ICICI Bank*, 565 B.R. at 250-51.  Specifically, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."  *Atl. Marine*, 571 U.S. at 64.  A forum selection clause, after all, "represents the parties' agreement as to the most proper forum."  *Stewart*, 487 U.S. at 31.  Accordingly, in reviewing a Section 1404(a) motion that implicates a forum selection clause, the court "[need] not

---

[5]     The citizenship of a limited liability company ("LLC") is determined by the citizenship of each of its members.  *See, e.g.*, *Bayerische Landesbank, N.Y. Branch* v. *Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012); *New Millennium Cap. Partners, III, LLC* v. *Juniper Grp. Inc.*, No. 10 Civ. 46 (PKC), 2010 WL 1257325, at *1 (S.D.N.Y. Mar. 26, 2010); *Carden* v. *Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990).

consider arguments about the parties' private interests," and "may consider arguments about public-interest factors only."  *Atl. Marine*, 571 U.S. at 64 ("Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases.").

The Court considers the following public-interest factors in determining whether transfer is in the "interest of justice":

> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action[.]

*Piper Aircraft Co.* v. *Reyno*, 454 U.S. 235, 241 n.6 (1981) (internal quotation marks omitted); *see Atl. Marine*, 571 U.S. at 63 n.6.  Further, the party acting in violation of the forum-selection clause "bear[s] the burden of showing that public-interest factors overwhelmingly disfavor" litigating in the forum designated in the applicable forum selection clause.  *Id.* at 67.

Defendant asserts that the public interest factors here are strong enough to tip the analysis in its favor.  (*See* Def. Br. 18).  The Court, however, cannot agree.  The Court acknowledges the Eastern District of Texas's interest in having a local controversy decided at home.  But this case involves primarily federal law, of which the Eastern District of Texas and this Court are equally capable of applying.  Furthermore, while the Court recognizes that there is a significant amount of litigation in this District, the Court has no reason to believe that it cannot dispose of this matter as quickly as the Eastern District of Texas could.  Above all else, the Court recognizes that there is a significant

competing public interest in holding the parties to their bargain.  *See Bank* v. *Laptop & Desktop Repair LLC*, 206 F. Supp. 3d 772, 781 (E.D.N.Y. 2016) ("New York has a strong public policy of enforcing forum selection clauses so that parties are able to rely on the terms of the contracts they make." (internal quotation marks omitted)); *Atl. Marine*, 571 U.S. at 66 ("In all but the most unusual cases, …. 'the interest of justice' is served by holding parties to their bargain.").

For all these reasons, the Court concludes that the public-interest factors at stake do not "overwhelmingly disfavor" litigating in this Court.  *Atl. Marine*, 571 U.S. at 67.  The Court thus finds that transfer is not "in the interest of justice," and declines to transfer this case pursuant to Section 1404.

## CONCLUSION

Based upon the foregoing analysis, the Court hereby DENIES Defendant's motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and (3).  The Court further DENIES Defendant's motion to change and/or transfer venue pursuant to 28 U.S.C. § 1406(a) or § 1404(a).

The Court ORDERS Defendant to file its answer on or before **June 14, 2024**.  The Court further ORDERS the parties to meet and confer and submit a proposed case management plan on or before **June 21, 2024**.

SO ORDERED.

Dated:      May 30, 2024
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

32